UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERANCE MCNINCH and PEGGY MCNINCH, | |
| Plaintiffs, | Case No. 19-cv-2305 |
| v. | Judge Mary M. Rowland |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

This case arises from the tragic death of Jason McNinch, a former Chicago resident and employee at the Museum of Contemporary Art. After his death due to the toxic combination of cocaine and fentanyl in 2017, his parents, Plaintiffs Terance and Peggy McNinch, attempted to obtain accidental death benefits pursuant to Jason's employee welfare benefit plan under which Jason named them co-beneficiaries. After Defendant, The Guardian Life Insurance Company of America, denied benefits and a subsequent appeal, Plaintiffs brought suit in this Court pursuant to the Employee Retirement Income Security Act of 1974 (ERISA) seeking *de novo* review of Defendant's coverage denial. The parties have cross-moved for judgment under Federal Rule of Civil Procedure 52(a). For the reasons explained herein, this Court grants Defendant's motion [76], denies Plaintiffs' motion [74], and directs the Clerk to enter judgment in Defendant's favor.

1

I.  **Standard of Review**

   A.  **ERISA**

ERISA authorizes participants of employee benefit plans to sue to recover benefits due under the terms of those plans. *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 886 (7th Cir. 2015) (citing 29 U.S.C. § 1132(a)(1)(B)). Courts review a denial of benefits challenge under ERISA *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 303 (7th Cir. 2020); *Black v. Long Term Disability Ins.*, 582 F.3d 738, 743 (7th Cir. 2009). This Court has already determined that the *de novo* standard applies in this case. [25].

Under the *de novo* standard, district courts do not actually "review[ ] anything." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). Rather, this Court must make an "independent decision" about an employee's entitlement to benefits and come to an "independent decision" on both the legal and factual issues presented. *Id.* In other words, "what happened before the plan administrator is irrelevant in a *de novo* review case." *Dorris*, 949 F.3d at 304; *see also Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan*, 687 F.3d 320, 328 (7th Cir. 2012) (noting that any "procedural foibles" the insurer "may have made are irrelevant on appeal").

   B.  **Rule 52**

The parties have cross-moved for judgment on the papers and without a hearing pursuant to Federal Rule of Civil Procedure 52(a). This procedure "is

essentially a trial on the papers, and is well-suited to ERISA cases in which the court reviews a closed record." *Fontaine*, 800 F.3d at 885–86 (internal citation omitted). Because the court serves as the trier of fact under Rule 52(a), the court must "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1); *see Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008) ("When a federal judge is the trier of fact, he, unlike a jury, is required to explain the grounds of his decision."). In other words, this Court must "explain the grounds" of its decision and provide a "reasoned, articulate adjudication." *Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 822 (N.D. Ill. 2019) (quoting *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008)).

## II.   Findings of Fact

The following findings of fact come from the parties' proposed findings of fact and conclusions of law [75] [77], their responses to the opposing party's findings of fact and conclusions of law [78] [80], and the joint appendix [71].

### A.   Jason McNinch and the Plan

Jason McNinch was born on May 31, 1973 and died in October 2017. [71-3] at 23. Plaintiffs Terance McNinch and Peggy McNinch are Jason's parents. *Id.*

From October 1, 2012 until his death in October 2017, Jason worked as an information technology audiovisual (IT AV) manager at the Chicago Museum of Contemporary Art in Chicago, where he kept a normal schedule of forty hours per week, Monday through Friday. *Id.* at 26; [77] ¶ 14. As a Museum employee, Jason participated in the Museum's employee welfare benefit plan—the Museum of Contemporary Art Class 0001 AD&D, Optional Life, Dental, LTD, Life, STD, Vision,

3

Voluntary AD&D (the Plan). [77] ¶¶ 14, 15. Defendant Guardian insured the Plan via Group Policy No. G-00483436; Guardian also served as the Plan's Claim Fiduciary. *Id.* ¶ 16.

The Plan provided basic term life insurance coverage to Jason in the amount of $50,000, which Defendant paid to Plaintiffs in February 2018. *Id.* ¶ 17. The Plan also provided basic accidental death and dismemberment insurance coverage (AD&D) for specifically defined covered losses, including death. *Id.* ¶ 18. Specifically, the Plan states:

> We'll pay the benefits described below if you suffer an irreversible covered loss due to an accident that occurs while you are insured. The loss must be a direct result of the accident, independent of disease or bodily infirmity. And, it must occur within 365 days of the date of the accident.

[71-1] at 63. The maximum benefit for AD&D coverage amounted to $50,000. [77] ¶ 19. Certain exclusions apply to the accidental death coverage; relevant here, the Plan lays out a voluntary use exclusion as follows:

> We won't pay for any loss caused . . .
>
> by your voluntary use of a controlled substance, unless: (1) it was prescribed for you by a doctor; and (2) it was used as prescribed. A controlled substance is anything called a controlled substance in Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as amended from time to time.

[71-1] at 65. Jason named his parents, the Plaintiffs, as co-beneficiaries of his accidental death benefits. [77] ¶ 22.

### B. Jason's Death

In the week leading up to his death, Jason took a scheduled vacation, from October 25 to October 30, 2017. [75] ¶ 3; [77] ¶ 1.

4

According to the Medical Examiner case report (M.E. report), on October 31, 2017, at 4:56 p.m., a Chicago police officers conducted a wellness check at Jason's home in Chicago after a co-worker called 9-1-1 because Jason had not shown up to work. [71-4] at 139. Once the officers entered Jason's home, they found him unresponsive on a bed. *Id.* Jason was pronounced dead after EMS arrived on the scene. *Id.* The M.E. report states that "it is unknown when" Jason "was last known to be alive." *Id.* The report also notes that Jason's body was "decomposed," that there "was no trauma or foul play" and "no illicit drugs or paraphernalia on the scene." *Id.* In addition, the report notes that Jason "was arrested once in the past for heroin possession." *Id.*

In her report of postmortem examination (the autopsy report), the Cook County assistant medical examiner, Dr. Marta A. Helenowski, concluded that Jason's death occurred "due to combined drug (cocaine and fentanyl) toxicity." [77] ¶ 3; [71-3] at 16. Dr. Helenowski noted Jason's "manner of death" as an "accident." [71-3] at 16. Dr. Helenowski further wrote that Jason had a "History of heroin use" and that his "level of cocaine in cavity blood: [was] 49 ng/ml . . . [and the] level of fentanyl in cavity blood: [was] 2.6 ng/ml." [77] ¶ 7; [71-3] at 15. Jason's blood tests also detected 3.2 ng/mL of Delta-9-THC, the principal psychoactive ingredient of marijuana/hashish, and measured his blood alcohol level at 0.141g/100mL. [71-3] at 18, 19.

Cocaine is a Schedule II controlled central nervous stimulant drug, [77] ¶ 10, and fentanyl is a Schedule II synthetic morphine substitute anesthetic/analgesic, *id.*

5

¶ 11. There exists no evidence that a doctor prescribed cocaine or fentanyl for Jason. *Id.* ¶ 23.

### C. Jason's History of Alcohol and Drug Use

Jason's medical records reveal a history of nasal inhalation of cocaine and heroin and heroin addiction. [77] ¶ 41. On January 23, 2014, he visited Dr. Christian Stevoff, a gastroenterologist, complaining about early satiety, abnormal, stools, and rectal bleeding. *Id.* ¶ 42; [71-8] at 37. Dr. Stevoff noted that Jason's symptoms started three years ago "when he was put on methadone" and that his past medical history included "heroin addiction – last used 3 yrs ago." [71-8] at 37. Dr. Stevoff wrote that his "irregular BMs" were "most likely related to his excessive beer intake and long use of narcotics." *Id.* at 38.

A little more than two years later on April 8, 2016, Jason visited Dr. Douglas Duval, an internist, due to high protein levels in his urine. [77] ¶ 45; [71-8] at 10. At that visit, Jason confirmed a history of "nasal heroin and cocaine in past" and "heroin addiction." [71-8] at 10. Jason also reported to Dr. Duval that he entered a methadone treatment clinic eight months earlier (in August 2015), but that he had tapered off and no longer attended the clinic. *Id.* Dr. Duval advised Jason to limit his alcohol intake to two drinks per day and discussed options to assist Plaintiff with that effort. [77] ¶ 55.

### D. Defendant's Denial of Benefits

Plaintiffs timely filed claims for AD&D benefits with Defendant. [75] ¶ 25. On or March 14, 2018, Defendant issued its initial denial of AD&D benefits. *Id.* ¶ 29; [71-2] at 115. In the denial letter, Defendant cites the voluntary use exclusion and

wrote: "it is our position that [Jason]'s death was caused by his use of controlled substances, therefore, was not the direct result of an accident independent of all other causes. Furthermore, there is no evidence supporting the use was involuntary or pharmacy records confirming he had a doctor's prescription." [71-2] at 116.

In June 2018, Plaintiffs timely appealed Defendant's initial denial of AD&D benefits, contending that Defendant denial "was based on an inaccurate analysis of the policy terms, as well as unsupported assumptions as to the facts of this claim." [75] ¶ 38; [71-3] at 141. More specifically, Plaintiffs stated: "Guardian's assumption that Jason *voluntarily* took a lethal dose of cocaine laced with fentanyl, or even any other combination of cocaine and fentanyl, is unsupported by any investigative results or factual showing, and belies common sense given all we know about the opioid epidemic." [71-3] at 146. Among other materials, Plaintiffs submitted a temporary scheduling order issued by the United States Drug Enforcement Administration (DEA) in February 2018, which placed fentanyl-related substances on Schedule I of the Controlled Substances Act. [77] ¶¶ 32–33. The temporary order also observed that "Fentanyl is often mixed with heroin and other substances (such as cocaine and methamphetamine) or used in counterfeit pharmaceutical prescription drugs. As a consequence, users who buy these substances on the illicit market are often unaware of the specific substance they are actually consuming and the associated risk." *Schedules of Controlled Substances: Temporary Placement of Fentanyl-Related Substances in Schedule I*, 83 Fed Reg. 5188-01 (Feb. 6, 2018)).

7

After Defendant denied Plaintiffs' appeal, Plaintiffs filed their complaint in this Court, seeking $50,000 in accidental benefits under the Plan. [77] ¶ 39.

### E. Dr. Martin's Expert Opinions

Defendant retained Daniel J. Martin, Ph.D., ABPP, a board-certified psychologist, to provide expert opinions in this matter. [80]. For reasons previously outlined in a memorandum opinion and order, this Court denied Plaintiffs' motion to exclude Dr. Martin under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). [67].

Dr. Martin is a clinical psychologist who received his Ph.D. in clinical psychology from Ohio University. [71-9] at 3. He completed both a predoctoral fellowship and a two-year postdoctoral fellowship at the Yale University School of Medicine, focusing upon psychotherapy and assessment with adolescents and adults. *Id.* Dr. Martin has worked in the substance use disorder field for over twenty-five years and has published a number of research articles on treating substance use disorders in scientific journals. *Id.*

In his expert report, Dr. Martin opines that the records in this case indicate that Jason "likely met the DSM-5 diagnoses of Opioid Use Disorder, Alcohol Use Disorder, and Stimulate Use Disorder (cocaine)"; that the "substances in [Plaintiff]'s system at the time of his death are consistent with a substance use disorder"; that "it is more likely than not that he was aware that he was self-administering controlled narcotics/substances which were not prescribed by a doctor and which were not being used as prescribed"; and that given Jason's history of narcotics use and attending methadone clinic, "it is more likely than not that he was aware that cocaine was often

8

mixed with other substances." *Id.* at 3, 5, 6. DSM-5 is the standard classification of mental disorders manual used by mental health professionals in the United States. [77] ¶ 61. Dr. Martin also notes that, beginning in 2010, heroin and synthetic opioids like fentanyl have been driving an increase in cocaine-related overdose deaths. [71-9] at 6.

The parties agree that cocaine is a type of controlled substance that users may cut or combine with other substances to change or intensify the effects of the drug. *Id.* ¶ 67. They also agree that combining cocaine with substances like cannabinoids or fentanyl makes it more marketable to users who seek the intensified high that the drug combination provides. *Id.* ¶¶ 68–69.

### III. Conclusions of Law

The parties' cross-motions for judgment center around two legal disputes over the correct application of the Plan's language to the facts of this case: (1) whether Jason's death constitutes a covered accident under the Plan; and (2) whether, even if Jason's death were a covered accident, the Plan's voluntary use exclusion precludes coverage.

In conducting its independent review in this case, this Court looks to federal common law rules governing contract interpretation. *Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 618 (7th Cir. 2021); *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005). Under federal common law, this Court must give an ERISA plan its "plain and ordinary meaning," and construe it "as a whole, considering separate provisions in light of one another and in the context of the entire agreement." *Estate of Jones v. Children's Hosp. & Health Sys. Inc. Pension Plan*, 892

F.3d 919, 923 (7th Cir. 2018) (quoting *Schultz v. Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 838 (7th Cir. 2012)). Unless a document governing an ERISA plan presents an ambiguity, courts do not look beyond its four corners in interpreting its meaning. *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873 (7th Cir. 2001). Where terms are ambiguous, however, courts construe them in favor of coverage. *Tran v. Minn. Life Ins. Co.*, 922 F.3d 380, 382 (7th Cir. 2019).

### A. AD&D Coverage

This Court's analysis begins with whether Jason's death constitutes an accident triggering AD&D coverage under the Plan. Because Plaintiffs bear the burden to prove their entitlement to coverage, *Dorris*, 949 F.3d at 305, this Court resolves "doubts or gaps in the evidence" in Defendant's favor, *Cheney v. Standard Ins. Co.*, 831 F.3d 445, 451 (7th Cir. 2016).

The AD&D clause of the Plan provides:

> We'll pay the benefits described below if you suffer an irreversible covered loss due to an accident that occurs while you are insured. The loss must be a direct result of the accident, independent of disease or bodily infirmity. And, it must occur within 365 days of the date of the accident.

[71-1] at 63.

Pursuant to the plain language of the Plan, Plaintiffs must show that Jason's death was "due to an accident" to demonstrate their entitlement to coverage. [71-1] at 63. Where, as here, a plan does not define the term "accident," courts must construe that word in accordance with "common understanding as revealed in common speech." *Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 632 (7th Cir. 2010) (quoting *Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050, 1052 (7th Cir. 1991)).

10

In arguing that Jason's death constitutes a covered "accident," Plaintiffs rely exclusively upon the M.E.'s report ruling Jason's death an accident caused by combined drug toxicity. [75] ¶ 100; [82] at 2–3. Defendant counters that Jason's death was no "accident" because use of illicit narcotics comes with a substantial risk of overdose and death. [77] at 18–20. This Court agrees with Defendant.

Initially, that the medical examiner deemed Jason's death an "accident" does not mean that it qualified as an "accident" as contemplated under the Plan. Medical examiners generally only possess four choices when indicating the manner of death—suicide, homicide, accident, or natural—and those terms do not have the same connotations as they might in the context of policy interpretation. *See Ablow v. Canada Life Assurance Co.*, No. 3:02-CV-300(EBB), 2003 WL 23325805, at *6 (D. Conn. Nov. 19, 2003) (collecting cases). Moreover, for death to be legally deemed an "accident" under federal common law, (1) the deceased must have had a subjective expectation of survival; and (2) such expectation must have been objectively reasonable "which it is if death is not substantially certain to result from the insured's conduct." *Yasko v. Reliance Standard Life Ins. Co.*, 53 F. Supp. 3d 1059, 1064 (N.D. Ill. 2014) (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 463 (7th Cir. 1997)); *see also Martin v. Unum Life Ins. Co. of Am.*, No. 06-589-DRH, 2008 WL 895656, at *3 (S.D. Ill. Mar. 31, 2008) (noting that, to determine whether a death was accidental, courts in the Seventh Circuit ask: 1) whether the insured believed that his conduct would result in the injury or death; and 2) whether the insured's belief was reasonable).

The evidence in this case indicates that Jason's death was not accidental under these legal standards. The autopsy report indicates that Jason died from the toxic combination of cocaine and fentanyl; toxicology reports also revealed a high blood alcohol content and THC in his system. Jason had a prior history of cocaine and heroin use, heroin addiction, and excessive alcohol use and had sought treatment at a methadone clinic, thus making it substantially likely that he knew about the dangers of opiate dependence and usage, particularly when combined with other substances. Based upon the record, this Court concludes that even if Plaintiff had a subjective expectation of survival (prong 1) after using drugs, his expectations were objectively unreasonable (prong 2). It is well known that using controlled substances like cocaine and fentanyl—on their own or in combination—is incredibly dangerous and can lead to fatality. *See United States v. Brown*, 538 F. Supp. 3d 154, 170 (D.D.C. 2021) (describing fentanyl and cocaine as "two incredibly dangerous substances," both of which Congress has categorized as Schedule II substances with a "high potential for abuse") (quoting 21 U.S.C. § 812(b)(2)(A)); *United States v. Barnett*, No. 1:19-CR-50-MWM-1, 2020 WL 7062603, at *1 (S.D. Ohio Oct. 9, 2020) ("Fentanyl is one of the deadliest narcotics sold by drug dealers. Merely 2 milligrams is a lethal dose in most people."); *United States v. Walker*, 423 F. Supp. 3d 281, 286 (S.D.W. Va. 2017) ("Fentanyl and synthetic opioids are particularly dangerous because they can be—and often are—mixed with other drugs without the consumer's knowledge."). Accordingly, a reasonable person would know that using one or both of those substances substantially risked overdose and fatality, rendering Jason's death not

accidental as a matter of law. *See, e.g.*, *Jean Baptiste v. Securian Fin. Grp., Inc.*, No. 20-60888-CIV, 2021 WL 3883707, at *9 (S.D. Fla. Aug. 31, 2021) (holding that a decedent's death did not qualify as a covered accident where he "was self-administering dangerous drugs without a prescription, without direction from a physician, and at great risk to his own life—making death not an unintended, unexpected and unforeseen result of his voluntary conduct") (internal quotation omitted), *appeal dismissed sub nom. Baptiste v. Securian Fin. Grp., Inc.*, No. 21-13408-CC, 2021 WL 6425279 (11th Cir. Nov. 19, 2021); *Ablow*, 2003 WL 23325805, at *7 (holding that death "was not an accident" under federal common law where the decedent took forty-five tablets of ephedrine along with ¾ of a bottle of vodka); *Mullaney v. Aetna U.S. Healthcare*, 103 F. Supp. 2d 486, 494 (D.R.I. 2000) (deeming that a death was not "accidental" where the decedent was speeding at night and had consumed enough alcohol to "give him a blood alcohol level of nearly four times the legal limit").

Further, Plaintiffs fall short of establishing, as they must to obtain coverage, that Jason's death was "independent of disease." [71-1] at 63. As another undefined term, this Court gives the term "disease" its ordinary and popular meaning. *Tran*, 922 F.3d at 382. Dr. Martin, Defendant's expert, opined that Plaintiff likely met the DSM-5 diagnoses of opioid use disorder, alcohol use disorder, and stimulant use disorder, and that the "substances in [Jason]'s system at the time of his death are consistent with a substance use disorder." [71-9] at 3, 5. This Court is persuaded by this expert opinion that Jason's death was not independent of a substance use

13

disorder, particularly given Jason's history of nasal inhalation of cocaine and heroin and heroin addiction. Substance use disorders plainly fall within the common, everyday, dictionary meanings of the term "disease." Indeed, Black's Law Dictionary defines the term as "[a]ny disorder; any depraved condition." *Disease*, *Black's Law Dictionary* (11th ed. 2019), and The Oxford English Dictionary similarly defines "disease" as "an illness, ailment, malady, disorder," *Disease*, *The Oxford English Dictionary,* (2d ed. 1989).

Plaintiffs counter that the autopsy report contained no reference to "disease" as contributing to Jason's death. [82] at 3–4. But again, this Court finds the medical examiner's omission of the term disease of little import here, as there is no indication that the examiner had any access to or performed an analysis of Jason's medical history indicating drug and alcohol use. Viewing the evidence in totality—including Jason's medical records, the autopsy report, and Dr. Martin's opinions—this Court is persuaded that Jason's death was connected to a substance use disorder. Plaintiffs thus have not shown that his death was "independent of disease" as contemplated under the Plan. [71-1] at 63.

For these reasons, Plaintiffs have not met their burden of proving their entitlement to coverage.[1]

---

[1] Plaintiffs have also argued that this Court should ignore Defendant's argument that Jason's death was accidental because it did not provide that reason in its initial denial of coverage. [80] at 21. The standard of review is *de novo*, however, meaning that this Court independently reviews the record and any purported procedural missteps that Defendant previously committed are irrelevant. *See Marantz*, 687 F.3d at 328 (noting that, in conducting *de novo* review, the district court could consider a surveillance video as proper evidence even if the insurer failed to do so in its decision letters because the court possessed an obligation to conduct an "independent decision" as to coverage).

14

### B. The Voluntary Use Exclusion

Even if Plaintiffs did prove coverage, the voluntary use exclusion also applies to preclude Plaintiffs' entitlement to AD&D benefits. The voluntary use exclusion states as follows:

> We won't pay for any loss caused . . .
>
> by your voluntary use of a controlled substance, unless: (1) it was prescribed for you by a doctor; and (2) it was used as prescribed. A controlled substance is anything called a controlled substance in Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as amended from time to time.

[71-1] at 65. Defendant bears the burden to show the applicability of this exclusion. *Contreras v. United of Omaha Life Ins. Co.*, 250 F. Supp. 3d 338, 342 (N.D. Ill. 2017) (quoting *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007)). The parties do not dispute that: (1) Jason was not prescribed any controlled substance; and (2) fentanyl and cocaine constitute controlled substances within the Act. The parties' dispute thus boils down to whether Jason's death was caused by his "*voluntary* use of a controlled substance." [71-1] at 65 (emphasis added).

Defendant argues that the only reasonable inference this Court can draw from the record is that Jason voluntarily used the substances. Specifically, Defendant points to Jason's "long history" of cocaine and opioid use, as well as the lack of evidence suggesting any foul play. *See* [81] at 3–4. Again, this Court agrees with Defendant. The record shows that Jason had a long history of drug use, including cocaine and heroin inhalation; the medical examiner concluded his cause of death was due to the toxic combination of those two substances; and the record lacks evidence

15

of foul play. Based upon this evidence, the only reasonable inference this Court can draw is that Jason voluntarily used the drugs shortly before he died.

For their part, Plaintiffs emphasize that "no one, including them, knows how, when or under what circumstances the drugs that combined to kill Jason entered his system." [80] at 27. True, no one knows for sure exactly what happened leading to his death. But the record points strongly to the conclusion that Jason, a man with a long history of substance use, sought out and used a lethal combination of drugs. As discussed, there exists no evidence of foul play and no evidence of coercion that would raise an inference that Plaintiff involuntarily used the drugs.

Plaintiffs also argue that the voluntary use exclusion is inapplicable because the toxicology reports indicate that Jason died due to the *combined* use of cocaine and fentanyl yet Defendant has not established that Jason voluntarily used *both* cocaine and fentanyl. [80] at 25–26; *see also* [75] ¶¶ 116–17. Underlying this argument is Plaintiffs' intimation that Jason only sought to use cocaine and did not know that the compound he ingested also contained the much deadlier fentanyl. *See* [80] at 27 (discussing "fentanyl-laced narcotics that kill the unknowing"). This argument is both factually and legally flawed. As a legal matter, it makes no difference even if, as Plaintiffs claim, Jason intended only to use cocaine and had no clue he was also ingesting fentanyl. The voluntary use exclusion applies upon Jason's "voluntary use of *a* controlled substance," and thus, is triggered by Jason's voluntary use of cocaine, whether he knew or not that the cocaine mixture contained fentanyl. Moreover, as a factual matter, it is not plausible that an experienced drug user would not have been

16

aware of the risks of cocaine use. As Dr. Martin opined and as is commonly known, cocaine is often mixed with other substances including synthetic opioids. Given Jason's history of narcotics use and obtaining treatment for substance abuse, he was likely aware of that fact.

For these reasons, this Court finds that the voluntary use exclusion applies, thus providing Defendant another independent reason to deny AD&D coverage.

## IV. Conclusion

For the reasons explained above, this Court denies Plaintiffs' motion for judgment [74], grants Defendant's motion for judgment [76], and directs the Clerk to enter judgment in favor of Defendant. Civil case terminated.

E N T E R:

Dated: February 14, 2022

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge